IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 10, 2001 Session

## STATE OF TENNESSEE v. ROGER NEAL JAMES and GEORGE OSBORNE WADE

**Direct Appeal from the Circuit Court for Obion County**
**No. 9-430      William B. Acree, Judge**

---

**No. W2000-01301-CCA-R3-CD  - Filed March 15, 2002**

---

Following a consolidated trial, an Obion County Jury convicted Defendant Roger Neal James of the delivery of a controlled substance within 1,000 feet of a school. The jury convicted Defendant George Osborne Wade of the sale of a controlled substance within 1,000 feet of a school. The trial court sentenced Defendant James to twenty-five years incarceration and Defendant Wade to twenty-three years incarceration. Both Defendants now appeal. Defendant James contests the sufficiency of the convicting evidence, the admission at trial of evidence concerning a second drug transaction that took place after the transaction in this case, and the length of his sentence. Defendant Wade also contests the sufficiency of the convicting evidence. In addition, he argues that the trial court erred by refusing to grant a continuance of the case and that the Drug-Free School Zone Act is unconstitutional as applied to his case. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JOE G. RILEY, J., not participating.

Clifford K. McGown, Jr., Waverly, Tennessee (on appeal); Colin Johnson, Dresden, Tennessee, (at trial and on appeal), for the Appellant, Roger Neal James. Mary Ellen Stevens, Union City, Tennessee, for the Appellant, George Osborne Wade.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

In October 1999, the Obion County Grand Jury indicted the Defendants, Roger Neal James and George Osborne Wade, for one count each of the sale of a controlled substance and for one count

each of the delivery of a controlled substance. The indictment charging both Defendants alleged that the sale and delivery of the controlled substance occurred "on the grounds or facilities of a school or within one thousand feet . . . of the real property that comprised a public or private elementary school, middle school or secondary school." Following a trial, an Obion County jury convicted Roger Neal James of the delivery of a controlled substance within 1,000 feet of a school. The jury convicted George Osborne Wade of the sale of a controlled substance within 1,000 feet of a school. The trial court sentenced Defendant James to twenty-five years incarceration and Defendant Wade to twenty-three years incarceration.

Pursuant to Tennessee Rule of Appellate Procedure 3, both Defendants now appeal. Defendant James presents three issues for our review: (1) whether sufficient evidence was presented at trial to support his conviction; (2) whether the trial court erred by allowing into evidence proof of a second, unrelated drug transaction; and (3) whether the trial court erred by imposing upon him the maximum possible sentence in his range. Defendant Wade also presents three issues for our review: (1) whether sufficient evidence was presented at trial to support his conviction; (2) whether the trial court erred by refusing to grant a continuance of the trial; and (3) whether the Drug-Free School Zone Act, Tennessee Code Annotated § 39-17-432, is unconstitutional as applied to this case. We affirm the judgments of the trial court.

## I. FACTS

The following proof was presented at the consolidated trial of both Defendants: Lieutenant Rick Kelly of the Union City Police Department testified that at he was assigned to the Twenty-Seventh Judicial District Violent Crime and Drug Task Force. He stated that at the time of the crimes in this case, he was working on an undercover operation with Officer Kenneth Jones of the Milan Police Department and with a confidential informant named James Coble. Lieutenant Kelly testified that Coble began to work for the Task Force because "[h]e had a crack problem." Kelly explained that "confidential informants, for the most part, are people that are in the community that have drug problems and are involved in the drug business." Kelly explained that Coble "came to [the Task Force] because he had a cocaine problem, he lost his truck, he got aggravated because of that, . . . and he wanted to do something about the drug problem." Kelly stated that Coble, in his capacity as a confidential informant, was instructed either to make drug purchases for himself or to introduce police officers to "the right people" from whom the undercover officers could make purchases. According to Lieutenant Kelly, the Task Force paid Coble a total of $4,000 for his employment and $70 for his services involving the Defendants in this case.

Lieutenant Kelly testified that on February 12, 1999, he and other officers met James Coble and Officer Jones, who was to pose as a drug buyer, at a predetermined location. At the location, the officers searched Coble and equipped him with "a wire"; Officer Jones was provided with "buy money" in the amount of $250. The officers then began to monitor the "wire" that was placed on Coble as Coble and Jones left the location.

Kelly testified that Coble and Officer Jones drove to several locations looking for people from whom to buy drugs. He stated that at 2:32 p.m., the two men eventually arrived at a house located at 619 Morgan Street in Union City. Kelly reported that the house was located 351 feet from an elementary school, and he stated that he had measured the distance with a measuring wheel. Kelly testified that he listened to the transaction through the wire worn by Coble, and at 2:37 p.m., "a black male said that he had gone to get it . . . ." Kelly stated that Coble and Jones left the residence at approximately 2:41 p.m. with drugs obtained from the black male. After the transaction, Kelly collected the drugs, sealed them in an evidence bag, and hand-delivered them to the crime lab.

On cross-examination, Kelly testified that after the transaction, Officer Jones told the other officers over his monitor that he had "just dealt with Baby George." Kelly identified "Baby George" as Defendant George Wade. Kelly also stated on cross-examination that the wheel used to measure the distance between the house where the drug transaction took place and the elementary school was not calibrated before he used it to make the measurement. However, he testified that as he made the measurement, he "also stepped it off."

Lisa Mays next testified at trial. She stated that she is employed as a special agent forensic scientist by the Tennessee Bureau of Investigation Crime Laboratory in Jackson, Tennessee. Mays testified that she analyzed the substance at issue in this case. She reported that the substance contained 1.9 grams of cocaine base, a Schedule II drug which is commonly referred to as "crack cocaine." On cross-examination, Mays stated that she did not perform a quantitative analysis to determine what percentage of the 1.9 grams was actually cocaine; she testified that her tests revealed only that the substance contained cocaine base and that "it is relatively pure."

Kenneth Jones of the Milan Police Department testified that he is a narcotics investigator for the West Tennessee Judicial Violent Crime and Drug Task Force, and he stated that he was involved in the undercover operation involving the Defendants in this case. Jones recalled that on February 12, 1999, he visited several locations with Lieutenant Kelly and James Coble, eventually ending up at the home on Morgan Street sometime after 12:00 p.m. There, Jones came into contact with a male subject whose street name is "Sweet James" and whom Jones identified in court as Defendant Roger Neal James. Jones reported that he asked Sweet James if he knew where Jones could purchase $250 worth of crack cocaine. According to Jones, "Sweet James went and talked to another black male by the name of Baby George. [They] then went into the house. Sweet James come [sic] into the house and told [the officers and Coble] that Baby George would be back in about five minutes, that he was going to get it." In court, Jones identified the individual known as "Baby George" as Defendant Wade.

Officer Jones testified that after Defendant Wade left the house, he waited at the house for Defendant Wade's return. Jones recalled that less than five minutes later, Defendant Wade returned and entered the kitchen of the home, followed by Defendant James. According to Officer Jones, less than five minutes later, Defendant James exited the kitchen, approached him and Coble, asked them "who had the money," and then instructed them to follow him into the kitchen. Jones testified, "Baby George had a large rock with crack in the kitchen, cutting smaller rocks off with a knife. He

then put 'em in a plastic bag, handed the plastic bag to . . . Sweet James. Sweet James handed me the plastic bag. I handed Sweet James the $250.00. I asked Baby George if that was the best he could do, and he said, 'Yes.' And then Sweet James handed Baby George the money, and I left the kitchen." Jones reported that after the transaction, he and the cooperating witness went to a predetermined location where they met Agent Kelly and gave him the drugs.

Officer Jones stated that the entire transaction took approximately a minute and a half. Jones maintained, however, that he had "no doubt in [his] mind at all" that the Defendants were the two men involved in the transaction. He stated that when he saw both men in the kitchen, "[i]t was daylight with the sun shining through . . . the windows." Jones also stated that he had seen Defendant James prior to the transaction and that he had seen a photograph of Defendant Wade since the time of the transaction.

Defendant Wade presented several witnesses in his defense. Twanii Sanders testified that at the time of the crimes in this case, she and Defendant Wade were romantically-involved roommates. She stated that neither she nor Defendant Wade had ever lived at 619 Morgan Street, the house where the transaction now at issue took place, and she maintained that she and Defendant Wade "were together from about 12:30 till about 5 . . . ." on the date of the crimes. Sanders recalled that at the time surrounding the crimes, she and Defendant Wade were in the process of moving into a new apartment. She reported that on February 12, 1999, she and Defendant Wade were at their home until shortly after 1:00 p.m., when they met with the person who was to be their new landlord. Sanders testified that the landlord showed them the apartment that they wished to rent at that time, and she stated that they finished viewing the apartment at approximately 1:30 p.m. She testified that she "believe[d]" that she and Defendant Wade then went to the cable company to set up service at the new apartment, an errand which took approximately ten to fifteen minutes. Sanders reported that she and Defendant Wade next went to the bank, and later in the afternoon, they visited the electric company at approximately 2:45 p.m., where they stayed until approximately 3:30 p.m. Sanders testified that after leaving the electric company, she and Defendant Wade visited the water company and then went to a store to buy cleaning supplies. Sanders stated that at approximately 4:30 or 5:00 p.m., she and Defendant Wade went to their new apartment. Sanders recalled that she soon left to pick up a friend who planned to help her clean. When she returned to the apartment, Defendant Wade left the apartment at approximately 5:00 p.m. Sanders testified that she did not know where Wade went after he left their apartment that evening, but she stated that he returned to the apartment later that night and painted his room.

Sanders testified that she was acquainted with Defendant James. She stated that she knew him as "Sweets," but called him "Sugar." Sanders reported that Defendant James helped move a couch into her new apartment after dark on February 12, 1999. On cross-examination, Sanders testified that at the time of the crimes in this case, Defendant Wade drove a light blue, two-door Monte Carlo. Finally, Sanders testified that she and Defendant Wade had been corresponding while he was in prison, and she stated that "depending on the time" that Wade might be required to serve in prison, she could be interested in renewing their relationship once Wade was released from custody.

Steve Goodrich testified that he owned the house located at 619 Morgan Street. He stated that on February 12, 1999, Nedra Harris and Glen Howard were renting the property. Goodrich explained that Glen Howard was the actual tenant of the house and stated that Ms. Harris, his aunt, was merely a co-signer on the lease. Goodrich reported that Glen Howard lived in the house from February until approximately the end of May. Goodrich testified that Howard became delinquent on his rental payments in April, and Goodrich subsequently served Howard an eviction notice.

Edna Roney testified that she owns the apartment that Defendant Wade and Twanii Sanders rented on February 12, 1999. Roney stated that Sanders was still renting the property at the time of trial and that Defendant Wade "came with [Sanders] when [Sanders] rented it." Roney recalled that both Sanders and Defendant Wade signed the lease on February 12, 1999. Roney could not recall the exact time of day that she met with Sanders and Defendant Wade on February 12, 1999. She stated, "I think it might have been around noon, but I wouldn't tell that for the real truth, 'cause I don't know. I just have so many, I can't remember."

Joy Carson testified that she works at First State Bank in Union City as a bookkeeper. She stated that she reviewed bank records from February 12, 1999 and could confirm that a withdrawal took place from Twanii Sanders' bank account at 2:05 p.m. that day. She reported that she did not handle the transaction herself, but stated that she recognized Sanders' signature on the bank slip.

Penny Petty testified that she was a Customer Service Representative for the Union City Electric System. Petty reported that on February 12, 1999, a deposit for service was made in the name of Twanii Sanders. She stated that the "meter order was made at 3:38" in the afternoon, and she testified that the person making the deposit is usually present at the time that a meter order is made.

Defendant James testified on his own behalf at trial. He first admitted that on February 12, 1999, he was at the house located at 619 Morgan Street. However, he claimed that he was there to clean the carpets in the house, as requested by the owners of the property. Defendant James testified that James Coble stopped by the house while he was working there. James reported that he was alone in the house when Coble stopped by because the tenant of the house, Glen Howard, had gone to the store to purchase extra "carpet shampoo." According to Defendant James, Coble asked him: "Is anybody selling anything here?" Defendant James testified that he told Coble he "didn't know" and that no one was in the house except him. James stated that Coble then left and returned ten to fifteen minutes later with another man. He testified that although he was unsure, he thought that the man who arrived at the house with Coble was Officer Kenneth Jones.

Defendant James testified that when Coble and the man whom he believed to be Officer Jones returned to the house, Howard had also returned to the house. James reported that Howard and the man went into the kitchen while he and Coble remained in the living room. Defendant James stated that he had "a good idea" of what the two men were doing in the kitchen because Coble had previously "asked about some drugs." Defendant James reported that the man stayed in the kitchen for approximately ten minutes, returned to the living room, looked at Coble, and asked, "Are

-5-

you ready to go?" According to James, the man then told Howard, "Thanks a lot" and departed. Defendant James claimed that Defendant Wade was not present at the house at any time during the afternoon of February 12, 1999.

On rebuttal, the State recalled Officer Kenneth Jones to the stand. Jones reiterated that both Defendant James and Defendant Wade were present at the house on Morgan Street on February 12, 1999. He testified that when working undercover, it is very important for an undercover officer to ascertain the identity of the individuals who sell drugs to him or her. He stated, "You make sure you visualize that person. You put that person's looks, identify in your memory, in your focus, and you keep it there because that's going to be . . . very important." In addition, Officer Jones recalled that a light blue Monte Carlo was parked in front of the house during the transaction on February 12, 1999.

Officer Jones further testified that on February 17, 1999, he returned with James Coble to the house on Morgan Street, again while working undercover. Jones reported that a second drug transaction took place on February 17, 1999. Jones stated that on February 17, 1999, several subjects were present at the house, including Defendant James and Glen Howard.

The State also called James Coble to the stand on rebuttal. Coble testified that Defendant James and Defendant Wade were involved in the drug transaction that took place on February 12, 1999. He stated that Defendant Wade "drove up in the car" after he, Officer Jones and Defendant James had entered the house on Morgan Street. Coble further testified that on February 17, 1999, he returned to the house, where he saw Defendant James and Glen Howard. Coble reported that Defendant Wade was not present during the transaction that took place on February 17, 1999.

On cross-examination, James Coble discussed his prior criminal record. He stated that he had previously been convicted of forgery, receiving stolen property, and food stamp fraud. Coble reported that no charges were pending against him at the time he began to work for the Drug Task Force. Coble testified that he started using cocaine in 1992 and stopped using it in 1998, when he went to a rehabilitation program; he stated that he was smoking marijuana during the time he was employed by the Drug Task Force, but he denied that he smoked marijuana during the hours that he was actually working. Coble testified that he was unemployed and stated that he decided to work for the Drug Task Force after he became involved in "a feud with some drug dealers over a truck that [he] owned." He hoped to "get [his] truck back" while working for the Drug Task Force, and he stated that he began working as an informant "to make money."

## II. ANALYSIS

### A. Sufficiency of the Evidence

Both Defendants contend that insufficient evidence was presented at trial to support their convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Defendant Roger Neal James was convicted of the delivery of a controlled substance within 1,000 feet of a school. Defendant George Osborne Wade was convicted of the sale of a controlled substance within 1,000 feet of a school. Tennessee Code Annotated § 39-17-417 states that it is an offense for a defendant to knowingly "[d]eliver a controlled substance," Tenn. Code Ann. § 39-17-417(a)(2), or to knowingly "[s]ell a controlled substance." Id. § 39-17-417(a)(3). Cocaine is considered a Schedule II controlled substance. See id. § 39-17-408(b)(4). "'Deliver' or 'delivery' means the actual, constructive, or attempted transfer from one person to another of a controlled substance, where or not there is an agency relationship . . . ." Id. § 39-17-402(6). Finally, the Drug-Free School Zone Act states that "[a] violation of § 39-17-417 . . . that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school or secondary school shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation." Id. § 39-17-432(b).

The State presented the following evidence at trial: Officer Kenneth Jones testified that he encountered Defendant James at approximately midday in a private residence and asked James if he knew where Jones could purchase cocaine. Officer Jones stated that Defendant James spoke with Defendant Wade, who left the property and returned shortly. Jones stated that both Defendants entered the kitchen of the house and that Defendant James then approached Jones and asked for money. Jones testified that Defendant Wade cut a portion of crack cocaine, put it in a bag, and handed it to Defendant James, who in turn handed the bag to Jones. Officer Jones stated that he then gave Defendant James money in exchange for the cocaine, and Defendant James handed the money to Defendant Wade. An employee of the Tennessee Bureau of Investigation Crime Laboratory verified that the substance which Officer Jones obtained from the Defendants contained cocaine. Lieutenant Rick Kelly testified that he monitored the transaction using an audio "wire" and verified

much of Officer Jones' testimony. Lieutenant Kelly also testified that he measured the distance between the house where the transaction took place and a nearby school, both by using a measuring wheel and by "stepp[ing] it off," and he reported that the distance measured 351 feet. Finally, James Coble testified that in his capacity as a confidential informant, he assisted Lieutenant Kelly in buying the cocaine, and he stated that both Defendant James and Defendant Wade were involved in the transaction.

This is clearly evidence to support the jury's findings of guilt. The evidence supports the jury's conclusion that Defendant James delivered the cocaine to the officer and its conclusion that Defendant Wade sold the cocaine to the officer through Defendant James. Although Defendant Wade presented testimony by several witnesses, primarily his girlfriend, to establish his whereabouts at the time of the transaction, the jury apparently discredited the testimony of these witnesses in favor of testimony by the undercover officers and confidential informant. We may not disturb these findings by the jury on appeal.

## B. Proof of Another Crime Committed by Defendant James

Defendant James argues that the trial court erred by allowing evidence of another drug transaction to be admitted at trial. On direct examination, Defendant James testified that on February 12, 1999, a man whom he believed was Officer Jones went into the kitchen of the house on Morgan Street with the tenant of the house, Glen Howard. Defendant James denied being involved in any drug transaction that may have taken place between Jones and Howard that day, and he maintained that Defendant Wade was not present at the house on February 12, 1999. On cross-examination, Defendant James was asked whether he was "sure [he did not] have the dates of February 12th and February 17th confused," and he responded that he did not. He also testified that he was not at the house on Morgan Street on February 17, 1999.

Following this testimony, the trial court held a bench conference outside the hearing of the jury, during which Defendant James' attorney objected to any further questions from the State pertaining to a second drug sale that took place on February 17, 1999. The trial judge then conducted a jury-out hearing on the issue. At the hearing, the State requested the opportunity to present rebuttal evidence to demonstrate that on February 17, 1999, Defendant James and Glen Howard were present at the same Morgan Street house when a second drug transaction took place, but that Defendant Wade was not. The defense argued that evidence concerning the second drug transaction was irrelevant to the case being tried and that it was highly prejudicial to Defendant James. The State countered that Defendant James had "opened the door" by asserting that Defendant Wade was not present at the Morgan Street house and therefore that Wade was not involved in the drug sale that took place at the Morgan Street house on February 12, 1999. When Defendant James asserted that Defendant Wade was not present on February 12 and that Glen Howard was present and involved in the February 12 drug transaction, Defendant James' testimony appeared to the State to be an accurate description of events that occurred in the Morgan Street house on February 17, 1999, rather than a description of the events that occurred on February 12, 1999. Thus, in the State's view,

rebuttal evidence concerning the events of February 17, 1999 was highly probative as to the accuracy of Defendant James' assertion that Defendant Wade was not present on February 12, 1999.

At the conclusion of the jury-out hearing, the trial court agreed with the State and ruled, in part, as follows:

> Mr. Johnson, I'm going to allow the evidence to come in. What has happened in this case is that Mr. James has taken the witness stand and he has testified that Mr. Wade was not there on February 12. He has testified that someone came - - or that Mr. Coble and Mr. Jones came and bought drugs on that date, but that they bought them from Mr. Howard and not from him, that he didn't know what was happening. He was asked on cross examination if it was possible that he may have been mistaken about the date that he was talking about and if that might have been on February 17th. If I recall his testimony correctly, he said, "No, that is not possible. I was not there then." I think the State is entitled to come in, under Rule 404(b), and introduce this evidence to show a complete story of the crime, refute his testimony, and the jury can take that or not take it.

Tennessee Rule of Evidence 404(b) provides as follows: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Before evidence may be admitted pursuant to Rule 404(b),

> (1) [t]he court upon request must hold a hearing outside the jury's presence;
> (2) [t]he court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) [t]he court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(3).

In this case, pursuant to Rule 404(b), the trial court held a hearing outside the jury's presence to determine the admissibility of evidence concerning Defendant James' involvement in a drug transaction occurring at the Morgan Street house on February 17, 1999, five days after the date of the offense for which both Defendant James and Defendant Wade were being tried. The trial court determined that a material issue existed other than conduct conforming with a character trait. According to the trial court's ruling, this issue arose when Defendant James testified to the jury that Defendant Wade was not present in the Morgan Street house on February 12, 1999, when a drug transaction occurred. Defendant James testified that Glen Howard was present in the Morgan Street house on February 12, 1999. Defendant James also acknowledged that a drug transaction probably occurred in the kitchen of the house on February 12, 1999. With this testimony, Defendant James presented to the jury a material issue as to whether Defendant Wade was present in the house on February 12, 1999, which was certainly a material issue in the State's case against Defendant Wade.

With regard to Tennessee Rule of Evidence 404(b)(3), the trial court did not explicitly state in the record that the probative value of the disputed evidence outweighed the danger of unfair prejudice to Defendant James. However, it is clear from a reading of the entire record that such a finding was implicit in the ruling of the trial court admitting the disputed evidence. Additionally, the trial court instructed the jury as follows:

> If you find from the proof that the defendant has committed a crime other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. The evidence may be considered by you for the limited purpose of determining whether it provides a complete story of the crime, that is, such evidence may be considered by you where the prior crime and the present alleged crime are logically related or connected or are part of the same transaction so that proof of the other tends or is necessary to prove the one charge or is necessary for a complete account thereof.

In our view, the trial court substantially complied with the requirements of Rule 404(b). When the proffered evidence is subject to the procedural requirements of Tennessee Rule of Evidence 404(b) and when the trial court has substantially complied with those requirements, any decision as to whether to admit evidence under Rule 404(b) will be reversed only for an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Because the term "discretion" essentially "denotes the absence of a hard and fast rule," State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999), we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Id. (citing State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Although we have concluded that the trial court did not commit error in admitting the evidence pertaining to the second drug transaction, a thorough review of the entire record leads us to the conclusion that even if the admission of the evidence pertaining to the second drug transaction was error, such error did not "more probably than not affect the judgment" under Tennessee Rules of Appellate Procedure 36(b). The Defendant James admitted that he was present at 619 Morgan Street in Union City, Tennessee on February 12, 1999 at the time of the drug transaction described by Coble and Officer Jones. Both Coble and Officer Jones identified Defendant James as being in the kitchen of the house and taking part in the drug sale on February 12, 1999. Thus, even if error occurred, the error did not affirmatively appear to have affected the result of the trial on the merits and therefore was harmless. See Tenn. R. Crim. P. 52(a).

## C. Sentencing of Defendant James

Defendant James next argues that the trial court erred by sentencing him to the maximum possible sentence within his range. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and

circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence for a Class A felony is the midpoint of the sentencing range unless there are enhancement or mitigating factors present. Id. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

Defendant James contests the length of his sentence. The trial court sentenced him as a Range I standard offender to twenty-five years incarceration. Although the delivery of more than 0.5 grams of cocaine is generally classified as a Class B felony, see Tenn. Code Ann. § 39-17-

417(c)(1), the sale of such substance within 1,000 feet of a school is punishable one classification higher than its usual classification. See id. § 39-17-432(b). Thus, for purposes of sentencing, Defendant James' crime is considered a Class A felony. The sentencing range for a Range I standard offender convicted of a Class A felony is between fifteen and twenty-five years. Id. § 40-35-112(a)(5).

In sentencing Defendant James, the trial court found no mitigating factors, but applied two enhancement factors. The court first applied enhancement factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range . . . ." Id. § 40-35-114(1). In applying this factor, the trial court stated, "The record reflects that Mr. James has twelve prior misdemeanor convictions and three prior felony convictions. . . . Mr. James indeed has a very lengthy history of criminal conduct." The record supports imposition of this enhancement factor.

The trial court also applied enhancement factor (13)(A), that "[t]he felony was committed while on . . . [b]ail, if the defendant is ultimately convicted of such prior felony . . . ." Id. § 40-35-114(13)(A). In applying this factor, the court noted that Defendant James was charged with the sale of cocaine, for which he was placed on bail on December 23, 1998, and that he was tried and found guilty of the crime on July 15, 1999. Because the crime in this case took place on February 12, 1999, within that time period, the record supports imposition of this factor.

The trial court considered the appropriate sentencing principles and all relevant facts and circumstances. The court conducted a thorough analysis of the mitigating and enhancement factors. The court found no mitigating factors and applied appropriate enhancement factors in sentencing Defendant James. The weight given to each factor was within the trial court's discretion. See Shelton, 854 S.W.2d at 123. For these reasons, we conclude that trial court properly sentenced Defendant James to twenty-five years incarceration.

## D. Defendant Wade's Motion to Continue the Trial

Defendant Wade contends that the trial court erred by failing to grant his motion for a continuance of trial. On December 10, 1999, counsel for Defendant Wade filed a motion for a continuance, in which she argued that there was inadequate time to prepare for trial. In the motion, counsel stated that "a number of witnesses who would be supportive of Mr. Wade's position are extremely difficult to locate . . . ." However, at a pretrial motion hearing, Defendant Wade subsequently informed the court that he did not wish to continue the case, stating, "I wanna [sic] to get it over with." The trial court therefore denied the motion and ordered the parties to proceed to trial as scheduled.

Tennessee Code Annotated § 40-14-105 provides as follows: "Every person accused of any crime or misdemeanor whatsoever shall be entitled to fourteen (14) full days (Sundays and legal holidays excluded) after arrest and the return of the indictment or presentment before being tried for such offense." The indictment in this case was filed on November 10, 1999, and an arrest warrant

was issued on November 15, 1999. The trial took place on December 21, 1999. Thus, under statute, Defendant Wade was allowed sufficient time to prepare for trial.

We further note that the grant or denial of a continuance is a matter within the sound discretion of the trial court which will not be disturbed on appeal absent a clear showing of prejudice to the defendant. State v. Goodman, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982). In this case, Defendant Wade specifically informed the court that he did not wish to continue his case, and the trial court denied the request for a continuance based on Defendant Wade's wishes. Moreover, although the request for a continuance was based on counsel's need for more time to locate witnesses to testify on Defendant Wade's behalf, we note that several witnesses actually testified at trial for Defendant Wade. Defendant Wade has thus failed to show that he was prejudiced by the trial court's denial of a continuance. This issue is without merit.

### E. Constitutionality of the Drug-Free School Zone Act

Finally, Defendant Wade challenges the constitutionality of the Drug-Free School Zone Act as applied to his case. As previously stated, the Drug-Free School Zone Act provides, in pertinent part, that when the delivery or sale of a controlled substance takes place on the grounds or within 1,000 feet of the grounds of a school, the offender "shall be punished one (1) classification higher than" he or she would normally be punished for such a violation. Tenn. Code Ann. § 39-17-432(b). This Court has previously upheld the constitutionality of the Act. See State v. Jenkins, 15 S.W.3d 914 (Tenn. Crim. App. 1999). Having reviewed the record, we conclude that there are no circumstances in this case that would require us to reconsider the decision of this Court in State v. Jenkins. Id.

Defendant Wade first argues that he had no right of ownership in the property where the violation in this case took place. However, the language of the Drug-Free School Zone Act does not require that a violator of the Act have a possessory interest in the property where the drug transaction takes place. Thus, Defendant Wade's argument that he did not own the house where the transaction in this case took place has no merit.

Defendant Wade also complains that "[t]he Drug Task Force chose the site . . . and set up a situation of fostering the dangerous activity of selling drugs near an elementary school." We find no evidence in the record that the officers involved in the undercover operation that resulted in the Defendants' arrests acted improperly in conducting the operation. No evidence was offered at trial to show that the officers "set up" a situation whereby drug dealers would be encouraged to sell drugs in close proximity to a school. Nor was evidence offered to show that the officers in any way lured Defendant Wade to the location where the transaction took place. The officers and the confidential informant testified that after driving to several different locations, Officer Jones and the confidential informant encountered Defendant James, who, of his own volition, then summoned Defendant Wade to take part in the drug deal. This testimony was uncontroverted at trial. We conclude that this issue is without merit.

Accordingly, we AFFIRM the judgments of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE